UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:17CR221 (AWT) |
|---|---|---|
| v. | : | |
| | : | |
| OMAR VILLARREAL | : | April 8, 2019 |

THE GOVERNMENT'S SENTENCING MEMORANDUM

On August 30, 2018, defendant Omar Villarreal pled guilty to one count of aiding and abetting the possession with intent to distribute and distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and one count of travel in interstate commerce to promote an unlawful activity in violation of 18 U.S.C. § 1952(a)(3). He has been detained since his arrest on May 15, 2017. This Court is scheduled to sentence the defendant on May 8, 2019.

The Offense Conduct

Through information supplied by a cooperating source ("CS"), the DEA New Haven District Office identified Omar VILLARREAL as a person who had traveled to Connecticut in the fall of 2016 to oversee a large shipment of heroin coming to Connecticut from California. DEA determined that VILLARREAL was using telephone numbers (626) 409-9079 and (626) 464-9266. In particular, VILLARREAL travelled to Connecticut, arriving at Bradley Airport sometime in October 2016, and returned to California just before Thanksgiving of that year. While in Connecticut, VILLARREAL lived at a residence at 161 Prospect Avenue, in Waterbury. In October 2016, agents conducted surveillance of the multi-family home located at 161 Prospect Avenue and verified that VILLARREAL was using that residence. They obtained documentation from a local food service business from which, during this timeframe, VILLARREAL was receiving food deliveries in his name at this address. Also, Western Union records, surveillance footage from a Stop and Shop located

on Reidville Drive in Waterbury (which is where the Western Union transaction took place), and information from CS revealed that, in or about October 2016, VILLARREAL received funds through Western Union while in Waterbury, Connecticut through wire transfer services. According to CS, the Western Union monies were intended to fund VILLARREAL's living expenses while he was in Connecticut. VILLARREAL was a resident of California. The sole purpose of his trip to Connecticut in October 2016 was to make arrangement for the large shipment of narcotics which would occur in December. According to information developed by DEA, the plan was to set up a stash house in Waterbury where the drug shipment could be taken and then distributed in smaller quantities to individual drug traffickers from the Northeast.

On December 20, 2016, several weeks after VILLARREAL had left Connecticut to return to California, he contacted CS to advise that a large shipment of narcotics would be arriving in Orange, CT in the early hours of December 21, 2016. During the morning hours of December 21, 2016, an individual subsequently identified as Erick Crespo ESCALANTE contacted CS and advised that he had the shipment and that was in Orange. ESCALANTE was driving a tractor-trailer. Under DEA direction, CS directed ESCALANTE to an address in Waterbury to off-load the drug shipment. Upon learning ESCALANTE'S location, the DEA conducted surveillance of ESCALANTE. When ESCALANTE was on Route 34 in Derby, the DEA assisted the Derby and Shelton Police Departments with a motor vehicle stop of ESCALANTE's tractor-trailer.

Specifically, Derby Police Department Patrol Officer Sicsico informed the DEA that the Derby Police had conducted a motor vehicle stop of a large 18 wheeler tractor trailer truck bearing Arizona Registration AG93092, VIN #3HSCUAPR2BN267511, with an attached trailer bearing Arizona registration 02743C, VIN #1UYVS253XAU066601, which were both registered to Eric ESCALANTE, for State of Connecticut motor vehicle violations on Route 34 in Derby, CT. ESCALANTE was pulled over for failing to stay in his lane and failing to drive in the proper lane,

in violation of Conn. Gen. Stat. § 14-236. During that stop and the initial roadside interview of ESCALANTE, who was the only occupant inside the vehicle, ESCALANTE indicated that he was currently looking for somewhere to park his truck. ESCALANTE further advised officers that he recently had made a drop of cargo in Orange and was not familiar with where to find diesel fuel for his truck. Officers indicated that ESCALANTE appeared abnormally nervous and at times appeared confused as to where he was going and from where he was coming.

Officers observed a large cardboard box located on the front passenger seat of the truck. Officers asked ESCALANTE what was in the box. He replied "Shit" and said that the officers could have the box. This statement raised the officers' concerns and, coupled with ESCALANTE's behavior to that point, they believed he was involved in some type of criminal behavior. They asked him to exit the vehicle and to speak with the officers at the rear of the truck. While speaking with ESCALANTE at the back of the truck, officers requested a Shelton Police Department K-9 handler to respond to the scene. ESCALANTE told the officers that he would let them talk to the dispatcher to explain where and why he was in Connecticut. Officers subsequently spoke with his company dispatcher who advised the officers that ESCALANTE had failed to notify them that he was leaving the last stop where he was scheduled to make a delivery.

A short time later, Shelton Police K-9 Officer Daniel Loris and his K-9 partner "Stryker" arrived on the scene. Officer Loris and Stryker conducted an exterior sniff of the vehicle. During the external sniff, Stryker alerted to the area of the driver's side door of the vehicle. This positive alert and indication was for the presence of narcotics in the front cab portion of the vehicle.

Based on the positive alert of the driver's side door of the truck, Officer Loris and Stryker then conducted a search of the interior of the cab portion of the truck. During the search, Stryker alerted to the positive presence of narcotics on the box that was placed on the front passenger seat of

the vehicle. This was the same box that ESCALANTE tried to give to the initial officers who pulled him over. Stryker also hit on several other areas inside the cab of the truck during the search.

After the positive alert from Stryker, officers retrieved the box from the front passenger seat of the vehicle and relocated it to where another police vehicle was parked. Officers subsequently opened the box and discovered 25 brick-like packages placed inside vacuum-sealed bags. All the packages also contained markings and "stamps" which appeared to be from narcotics trafficking organizations to identify the location and the person where the narcotics were being shipped. Subsequently, the packages were weighed and tested using two different field tests. The tests were positive for the presence of fentanyl. The packages weighed approximately 55 pounds. A subsequent lab test confirmed that the 25 kilograms contained pure fentanyl, and no heroin.

The Derby Police and DEA arrested ESCALANTE on federal charges and transported him to their detention facility. ESCALANTE advised the officer on the scene that the package was not his and that the police could take it. In a post-arrest, post-*Miranda* interview with the DEA, ESCALANTE admitted that he had picked up the package in California. He then traveled from California to Baltimore, Maryland, where he was directed to go to an address in Waterbury, CT. After making a delivery in Orange, CT, he was heading to Waterbury to deliver the package. The Orange delivery did not involve narcotics.

On December 20, 2016, VILLARREAL used cellular telephone (626) 409-7934 to coordinate the December 21 fentanyl shipment by ESCALANTE. Toll records confirmed that VILLARREAL used cellular telephone (626) 409-7934 to contact ESCALANTE beginning on December 20, 2016 to coordinate the transportation and delivery of the fentanyl shipment. Toll analysis revealed a call from VILLARREAL to ESCALANTE at 10:54 P.M., on December 20, 2016, just prior to VILLARREAL contacting CS at 10:59 P.M. Additionally, the first contact between ESCALANTE and CS came at 6:00 A.M. on December 21, 2016. Following the seizure of the 25 kilograms of

fentanyl, call analysis shows multiple calls from VILLARREAL to CS between 12:45 P.M. and 1:00 P.M on December 21, 2016.

The Appropriate Sentence

With respect to the advisory guidelines calculation, the Government agrees with the United States Probation Office that the defendant is CHC II.  It is DOJ policy that the expanded Guidelines Section 5C1.2 provisions of the First Step Act should be applied to any defendant sentenced after the effective date of the First Step Act, namely December 21, 2018, even if the guilty plea pre-dated the First Step Act.  Accordingly, the Government believes that the defendant's total adjusted offense level is 31.  Further, to reflect the intent of the parties in the plea agreement, the Government does not oppose a *Fernandez* departure.  Accordingly, the Government requests that the Court adopt an advisory guidelines imprisonment range of 108-135 months.

Under 18 U.S.C. § 3553(a), the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as "to afford adequate deterrence to criminal conduct" by the public and "to protect the public from further crimes of the defendant."  An appropriate  sentence must also take into account "the history and characteristics of the defendant."  *See* 18  U.S.C. § 3553(a).

Here, the defendant engaged in a serious drug trafficking offense involving a substantial and, frankly, staggering quantity of fentanyl.  In 2018, there were 1017 drug overdose deaths in Connecticut.  760 of those deaths, approximately 75%, involved fentanyl.  By contrast, in 2012, only 4% of overdose deaths in Connecticut involved fentanyl.  To put it simply, fentanyl is the single most lethal substance that has found its way to Connecticut over the past five to six years and it has become more and more prevalent.  The photograph below represents the amount of

fentanyl that constitutes a fatal dose:



Heroin cut with fentanyl has increasingly become a problem in Connecticut's cities and surrounding communities. Connecticut is in the midst of an opiate crisis and heroin/fentanyl-related abuse, addiction and overdose deaths are front and center in this burgeoning epidemic. As a result, heroin and fentanyl trafficking has become a priority for federal law enforcement efforts in this district as well as nationwide. As the Court well knows, drug trafficking has a broad array of victims, from the individuals who become addicted, to families that are destroyed, to the erosion of educational and economic opportunities and the decay of whole neighborhoods. As the Court has seen in its own experience, the grip of opiate addiction for those that use can be difficult to escape.

Here, the defendant's offense conduct stemmed purely from his motive to profit. The defendant did not suffer from heroin addiction. He did not sell heroin to finance his own habit. The defendant grew up in a stable family environment and does not have the horrible background that the Court has seen many times in these cases. The defendant has demonstrated the capability of holding employment. Therefore, it appears that the defendant entered the drug trade solely because he saw an opportunity to make money at

the expense of others.  The risk to his community took a back seat to the money that he could make.  To put it simply, heroin addiction that is fueled by the profit motives of those dealing is destructive of individuals, families and entire communities throughout Connecticut.  Given his motivation of profit and the massive quantity of fentanyl involved in this scheme, a stringent sentence of imprisonment is necessary to promote respect for the law, to serve as just punishment and to serve as an adequate deterrent for those among the general public even contemplating entering the drug trade or who are still involved.  A message needs to be sent that the opportunity cost of trafficking large quantities of fentanyl into Connecticut is very high.  The fact that the steadiness of defendant's employment history is not entirely clear suggests that he poses some risk of recidivism.  Accordingly, there is some need for specific deterrence of the defendant.  The government notes that the defendant did not have any significant criminal history prior to this offense, did not have any prior drug-related convictions and did not receive the deterrent benefit of any prior incarceration.  The government also recognizes that, while defendant coordinated the delivery, he was not the ultimate mastermind behind this shipment.  Nonetheless, it is important that the defendant pay a significant enough price so that he understands the cost of the scope of the conduct in which he engaged and the cost if he were to commit such conduct in the future.

     Accordingly, the government advocates an 84 month sentence of imprisonment on the drug count with a 60 month sentence of imprisonment on the interstate travel to promote unlawful activity count to run concurrently.  The Government further requests a 3 year period of supervised

release to follow any term of imprisonment imposed. The government does not seek the imposition of a fine.

                Respectfully submitted,

                JOHN H. DURHAM
                UNITED STATES ATTORNEY
                /s/

                _____

                S. DAVE VATTI
                ASSISTANT UNITED STATES ATTORNEY
                Fed. Bar. No. ct11957
                Office of the U.S. Attorney
                450 Main Street, Room 328
                Hartford, CT 06103
                860-947-1101

## CERTIFICATION

I hereby certify that on April 8, 2019, the foregoing Sentencing Memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/
_____
S. Dave Vatti
Assistant U.S. Attorney